UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MATT TIGHE,<br><br>                                Plaintiff,<br><br>        v.<br><br>KING COUNTY, SCOTT GARNETT,<br>SARAH GERLITZ,<br><br>                        Defendants. | CASE NO. 2:17-cv-01875-BAT<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiff Matt Tighe brings a motion for partial summary judgment seeking summary disposition of his claim that King County violated the Uniform Services Employment and Reemployment Rights Act of 1994 (38 U.S.C. Pt. III, Ch. 43, hereafter USERRA) by failing to promptly re-employ him when he returned to the King County Sheriff's Office (KCSO) after military leave on two occasions and by wrongfully telling him that his protected benefits would expire should he serve more than five years in the military. Dkt. 41. King County and KCSO (hereafter collectively KCSO) argues that Plaintiff is not entitled to summary judgment because he was promptly and properly reemployed, KCSO discharged its obligations under USERRA, and there is no relief available to Plaintiff. King County brings its own motion for summary judgment on Plaintiff's USEERA claims and King County, Scott Garnett, and Sarah Gerlitz move for summary judgment dismissal of Plaintiff's claims under the Washington State Law

Against Discrimination ("WLAD"), RCW Chapter 49.60 Washington State Constitution, Art. I, § 7, and 42 U.S.C. § 1983. Dkt. 59-1[1].

This Order deals only with Plaintiff's USERRA claims. For the reasons set forth herein, the Court denies Plaintiff's motion for partial summary judgment and grants Defendants' motion for summary judgment on Plaintiff's claims that Defendant KCSO violated his USERRA rights.

## RELEVANT FACTS

The KCSO employed Plaintiff as a Deputy Sheriff from 2002 to 2016. Dkt. 42, Declaration of Plaintiff Matt Tighe, ¶2. From approximately July 9, 2010 through until July 1, 2014, Plaintiff served on orders with the U.S. Coast Guard Reserves. *Id.*, ¶3, Ex. A. Before going on the July 9, 2010 – July 1, 2014, period of military service, Plaintiff served with KCSO's Special Operations Marine Unit where he (i) worked out of the KCSO's Kirkland, Washington facility, (ii) performed search and rescue, maritime patrol, and diving duties, (iii) earned approximately 16.5 hours of overtime compensation each month and (iv) worked a 10 AM to 6 PM shift. Dkt. 42, Tighe Dec., ¶ 4, 12. Defendants contend that a review of Plaintiff's overtime records shows that a monthly average of overtime compensation is not an appropriate measure as there is no consistency to the overtime hours Plaintiff worked prior to his July 2010 leave. Dkt. 66, Declaration of Kimberly Petty (KCSO Project/Program Manager), Exs. A, B, C. It is also undisputed that the entire Marine Unit is transferred to patrol during the winter and this is standard practice due to funding. Dkt. 57, ¶8; 57-3; Dkt. 64, (Second) Jacobsen-Watts Dec. Ex. A, 26:4-13, 42:5-24.

On August 7, 2013, KCSO sent a letter to Plaintiff stating: "King County policy restricts military leave benefits to five years, and though you have some cushion left, we wanted to alert

[1] Originally filed at Dkt. 45.

ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 2

you that your military leave benefits would expire in August 2015." Dkt. 42, Tighe Dec., Ex. B.

While Mr. Tighe was on military orders between July 2010 and July 2014, he was on one type of paid leave or another for virtually the entire period. During this timeframe, KCSO continued to pay for 100% of medical benefits for Mr. Tighe and his family, and continued to contribute to his retirement. He also continued to accrue sick and annual leave. Dkt. 66, Petty Dec., ¶¶ 3,7, Ex. A.

**Plaintiff's 2014 Return to Work**

Plaintiff first contacted KCSO about his return to work in November 2013, stating: "I understand I will need training since I've been gone for quite some time and I look forward to knowing what my requirements are." Dkt. 57, Declaration of Jessica Lussier (KCSO HR Analyst), Ex. B. On March 3, 2014, Mr. Tighe notified KCSO that his first day back to work would be July 1, 2014. Dkt. 57, Lussier Dec., ¶7. On March 11, 2014, Plaintiff told Sergeant Stan Seo, Patrol Training Officer (PTO) and Field Ops Coordinator, that he did not "intend to push real hard to get back to the Marine Unit" and that he did not want to bump anyone because it would not be fair. Dkt. 64, Second Jacobsen-Watts Dec. Ex. A, p. 40.

On March 13, 2014, Alexandra R. Ehlert, a KCSO Human Resource Associate, notified Plaintiff by email that he would need to attend the Basic Law Enforcement Equivalency Academy and complete medical, psychological, background check and polygraph examinations. According to Ms. Ehlert, these requirements were because Plaintiff had been on leave for more than 24 months; they had nothing to do with the fact that his leave was due to military service. Dkt. 65, Declaration of Alexandra R. Ehlert, ¶ 3, Ex. A. On March 14, 2014, Plaintiff objected to the background investigation, polygraph, medical exam, and psychological exam. He noted that he had started a mediation process through the Employer Support for Guard and Reserve

("ESGR") advocate and an Ombudsman would be contacting KCSO. Plaintiff agreed that the "requirement to attend an equivalency academy, post BLEA, and portions of PTO2 are all warranted and make sense." *Id*.; Ehlert Dec. ¶3, Ex. A; Dkt. 42, Tighe Dec., ¶ 7, Ex. D.

On March 17, 2014 the ESGR advocate contacted Lance King, then KCSO's Senior HR Manager. Mr. King provided the advocate with the statute for receiving or reinstating peace officer certificates. Dkt. 49, Declaration of Lance King, ¶5. In a follow-up email, the ESGR advocate replied, "I truly appreciate your interest and concern. I have read the RCW you mentioned and understand your concern and the possible interpretation(s)." Dkt. 50, Jacobsen-Watts Dec., Ex. D, p. 6. King researched the issue, consulted with the Prosecuting Attorney's Office, and concluded that Plaintiff was required to follow Washington State law to reinstate his peace officer certificate. On March 24, 2016, King informed the ESGR advocate of the KCSO's position on the matter and assumed that the ESGR had accepted KCSO's explanation when he heard nothing further. Dkt. 49, King Dec., ¶ 5; Dkt. 50 Jacobsen-Watts Dec., Ex. D, p. 5.

On March 26, 2014, Plaintiff spoke with KCSO HR and asked questions about the jumpsuit, vehicle, computer, phone, and training he would receive and other details of his return. Dkt. 65, Ehlert Dec. ¶4, Ex. B. He did not renew any concerns he had previously expressed about the process during the conversation or in response to follow up emails that he exchanged with HR the next day. *Id*. He indicated he would likely need to attend the equivalency academy in October because of the timing of his military orders. *Id*.

According to KCSO records, Plaintiff took his polygraph on June 20, 2014, his psychological evaluation on June 22, 2014, and was medically cleared on July 3, 2014. Dkt. 65, Ehlert Dec., ¶ 5. Plaintiff completed post-BLEA training at the Advanced Training Unit (ATP) in late June and July 2104 and then spent approximately 10 days at Precinct 3 in Maple Valley,

Washington. *Id.*, ¶ 6, Ex. C. On August 13, 2014, he was assigned to the Marine Unit in Kirkland. *Id.*, Ex. D; Dkt. 57, Lussier Dec., ¶ 7. Plaintiff attended the equivalency academy from October 20 through October 31, 2014. *Id.*

Plaintiff alleges "approximately six weeks" of FTO training took place in Precinct 3 in Maple Valley, Washington. Dkt. 42, Tighe Dec., p. 4, ¶ 12. He also alleges that it was not until October 2014 until KCSO (after Plaintiff's repeated requests) transferred him to the Marine Unit. *Id.*, Tighe Dec. ¶13. Plaintiff alleges that while he was assigned to the ATP he lost overtime wages in July, August, and September 2014 of $3,572.00. Dkt. 44, Declaration of Erick West (Plaintiff's Economic Loss Expert), ¶3, Ex. A. KCSO records reflect, however, that Plaintiff was officially transferred to the Marine Unit on August 13, 2014 (where he continued to receive diver pay and start to receive regular longevity pay). Dkt. 65, Ehlert Dec., Exs. C, D (Personnel Order 2014-267).

By Plaintiff's own admission, then-Captain Somers had given him "the green light to return to work" and he had been working in the Marine Unit since around the beginning of August 2014, but had not yet "received orders to the Marine Unit and [was] currently still assigned to PCT#3." Dkt. 67, Somers Dec. Ex. C. At that time, Plaintiff "was very much interested to know where [he would] end up after boating season is over on September 15th" as he indicated he was "attending graduate school and has a personal/Coast Guard Reserve life to juggle." *Id.* He expressed his desire to stay in the marine Unit as a full time FTE, but also indicated that if he was only with the Marine Unit on a temporary basis, he would like to put a transfer in to another unit that has vacancies. *Id.* Plaintiff worked in the Marine Unit until October 1, 2014, when he and others in the Marine Unit were transferred to unincorporated patrol for the winter. Dkt. 57, Lussier Dec., ¶ 8; Exhibit C (Personnel Order 2014-265B).

Plaintiff testified that the whole unit went to patrol and depending on the year, this was standard practice due to funding. Dkt. 64, Second Jacobsen-Watts Dec. Ex. A, Tighe Dep., 26:4-13, 42:5-24. Plaintiff then attended the two-week equivalency academy October 20-31, 2014. Dkt. 65, Ehlert Dec. ¶ 6.

After attending the equivalency academy, Plaintiff worked patrol second shift, 1400 hours to 2200 hours, at Precinct 2 out of Sammamish, Washington. He transferred to Metro Transit Patrol in Seattle, Washington on December 2, 2014, where he also worked second shift, 1300 to 2300 hours. Dkt. 65, Ehlert Dec., ¶ 7, Ex. E (Personnel Order 2014-341).

Plaintiff was still assigned to Metro when he provided KCSO with travel orders dated August 25, 2015 showing he would be on military leave between September 1, 2015 and February 27, 2016. Pursuant to KCSO's practice with contract entities, approximately six weeks into his military leave, his vacancy was transferred from Metro to an unincorporated patrol position. He was returned to an unincorporated patrol position on February 29, 2016. Dkt. 57, Lussier Dec., Exhibit D (Plaintiff's military orders and 2/22/16 Personnel Order 2016-053A).

**Plaintiff's 2016 Return to Work**

In December 2014, Plaintiff voluntarily transferred to the Metro Transit Police ("Metro") as a patrol deputy. Dkt. 57, Lussier Dec., ¶ 11; Dkt. 64, Second Jacobsen-Watts Dec. Ex. A, Tighe Dep., 33:17; 43:4-14. He worked the second shift, 1300 to 2300 hours. Metro's headquarters is in Seattle, but it provides police services for transit property and bus stops all over King County. Dkt. 65, Ehlert Dec.¶7, Ex. E; Dkt. 57, Lussier Dec., ¶ 10. In August 2015, Plaintiff provided KCSO with orders showing he would be on military leave from September 1, 2015 through February 27, 2016. Dkt. 57, Lussier Dec., ¶11, Ex. D.

Metro has a contract with KCSO, similar to the cities of Kenmore and Sammamish. Dkt.

52, Declaration of Dave Jutilla (Chief of Metro), ¶ 5. The interlocal agreement with the contract entities allows the entity to request a replacement for a deputy on long-term leave within 15 days; however, in practice, the entity carries the vacancy on its roster for as many as 90 days and then transfers the vacancy to unincorporated patrol. *Id*., ¶5. Thus, approximately six weeks into Plaintiff's 2015 leave, he was transferred to unincorporated patrol, and automatically returned to that assignment when his military orders expired in February 2016. *Id*., ¶5; Dkt. 57, Lussier Dec., ¶11.

Upon Plaintiff's return, he was assigned to Precinct 4 unincorporated patrol, working the second shift, 1400 to 2200 hours. Precinct 4 is located out of Burien, Washington. Dkt. 65, Ehlert Dec. ¶8. In June, while still at Precinct 4, he transferred to first shift, 0600 hours to 1400. *Id*. A few weeks after his transfer to first shift, Plaintiff requested to transfer to Metro and he did so on July 1, 2016. Dkt. 57, Lussier Dec., ¶ 12, Dkt. 57-5. (Plaintiff lived in Issaquah, Washington. Dkt. 47, Gerlitz Dec., ¶ 7. Burien is approximately 20 miles from Plaintiff's residence. Seattle is approximately 17 miles from Plaintiff's residence).

Plaintiff did not request to return to Metro before July 2016 and KCSO had no reason to believe that he wanted to return to Metro. Dkt. 52, Jutilla Dec., ¶ 6. Plaintiff acknowledges that senior deputies work in unincorporated patrol. Dkt. Second 64, Jacobsen-Watts Dec. Ex. A, Tighe Dep., 22:23-24. Though the setting is different, the duties of a patrol deputy are roughly the same in unincorporated patrol and Metro, neither Metro patrol nor unincorporated patrol are specialized assignments, and the pay is identical. Dkt 57, Lussier Dec., ¶ 15. Plaintiff contends that Metro and unincorporated patrol are different because KCSO "does not assign rookie deputies to Metro." He alleges that KCSO customarily sends "rookie" deputies to unincorporated patrol, which he feels is understaffed when compared to Metro. Dkt. 42, pp. 4-5, ¶¶ 14, 15. The

Chief of Metro Transit Police since 2007 strongly disagrees with this characterization of unincorporated patrol, saying, "There is a much greater depth and breadth of type and complexity of cases in unincorporated patrol than in Metro. Patrol deputies may be more successful on the sergeant's examination." Dkt. 52, Jutilla Dec., ¶ 7.

Plaintiff applied for and received a medical retirement from King County effective October 4, 2016. Dkt. 57, Lussier Dec., Ex. F (October 5, 2016 personnel order 2016-429). He has not requested reinstatement. Dkt. 1-2. He is unlikely to work as a Sheriff's deputy in the future. Dkt. 64, Second Jacobsen-Watts Dec., Ex. B, David Shaw, M.D. Dep., 27:2-12; 56:7-58:25. He previously was offered assistance in finding another County job through the County's disability services program, but did not take advantage of the program because did not like any of the jobs available. *Id.*, Second Jacobsen-Watts Dec., Ex. A, Tighe Dep., 51:11-52:5.

**Requirements of RCW 43.101.095**

All KCSO deputies must, as a condition of continuing employment, obtain and maintain peace officer certification under Washington State law. RCW 43.101.095. To obtain a peace officer certification, deputies must submit to background investigations, polygraph assessments, and a psychological examination. *Id.* at (2)(a).

Plaintiff's peace officer certificate lapsed automatically after the break of more than twenty-four months in his service as a full-time law enforcement officer. RCW 43.101.125. To become recertified, Washington State required that Plaintiff attend a two-week Basic Law Enforcement Equivalency Academy ("BLEEA") at the CJTC. Dkt. 67, Declaration of Scott Somers (KCSO Undersheriff) ¶7; WAC 139-05-210. The equivalency process is limited to fully commissioned lateral hires from other states, officers who have already completed an equivalent academy in another state, or commissioned officers who have had a break in service of greater

than 24 months, but less than 60 months. WAC 139-05-210(a)-(d).

In order to attend the academy, a deputy must provide "a statement of the applicant's health and physical condition" and criminal records check. WAC 139-05-210(6). New recruits who have not previously been certified, or commissioned officers who have had a break in service of greater than 60 months, must attend a full 720 hour academy to satisfy the state's basic training requirement and obtain their certification. Dkt. 46, Jones Dec., ¶ 6.5

**Ongoing Training and Annual Re-certifications**

According to Undersheriff Scott Somers, part of the ongoing responsibility of being a KSCO Deputy assigned to any precinct or unit is participating in ongoing training and qualifications. Washington State law requires that fully commissioned officers complete a minimum of 24 hours of in-service training annually. WAC 139-05-300. The legal and policy environment in which a deputy works is constantly evolving. Dkt. 67, Somers Dec. ¶¶3, 8. All personnel are expected to be familiar with the General Orders Manual. *Id*. ¶3. All deputies must requalify and recertify with their firearms and Tasers, receive training on case law updates, recertify with various criminal justice information access systems, and receive emergency response training at regular intervals. *Id*. Plaintiff completed none of KCSO's required qualifications, certifications, or training while he was on leave. *Id*., Ex. B. Plaintiff returned to work on July 2, 2014 as a KCSO deputy with a temporary duty assignment in the ATS. Dkt. 57, Lussier Dec., ¶ 7, 57-2, p. 7. During his first month, Plaintiff completed 43 hours of ongoing training and annual recertifications, including firearms qualification, Taser certification, case law updates, recertifying with criminal justice information access systems, and other emergency response training that he needed to complete under State law and KCSO's policies which apply to all deputies. Dkt. 67, Somers Dec. ¶ 8, Ex. B.

**Post-BLEA and Field Training**

To ensure that a deputy is fully prepared for the rigors of the job, KCSO has an established process for training deputies. Dkt. 67, Somers Dec., ¶ 7. Experienced out-of-state lateral hires and KCSO members returning from leaves of absence of over two years attend the two-week BLEEA. *Id*. These members also complete required trainings, certifications, and qualifications in what KCSO refers to as "post-BLEA," at its ATS and spend some time with a Patrol Training Officer ("PTO") or Master Police Officer ("MPO") which is referred to as Phase II and Phase III training. *Id*. The length of time that a deputy spends training with a PTO and/or MPO varies depending on the skill level of the deputy. *Id*. "post-BLEA" does not necessarily always take place after the BLEA or BLEEA. During the relevant timeframe, if a lateral hire or deputy returning from leave was not able to get into the academy right away, they went into the field and did the post-BLEA and FTO before the two week equivalency academy. *Id*., Ex. B.

## DISCUSSION

**A.    Motions to Strike[2]**

Defendants move to strike portions of Mr. Tighe's declaration (Dkt. 42) on the grounds that several statements contained therein are hearsay or contradict his sworn testimony (¶9 conflicts with his deposition testimony at 22:24-24:8; and ¶12 conflicts with prior testimony (*Compare* Dkt. 42 ¶¶ 9, 10, 12 with Dkt. 64, Second Jacobsen Watts Dec. Ex. A, 14:3-6,18:5-9,19:8-9, 22:24-24:8, 41:1-42:4)). Further, ¶10 includes an out of court statement by a fellow deputy who is not a party. To the extent any of Mr. Tighe's declaration testimony conflicts with his deposition testimony, those conflicts go to the weight of his testimony and not to their

---

[2] The Court addresses only those motions to strike evidence relating to the USERRA claims in this Order.

admissibility. To the extent any of his testimony is improper, it was not considered. The statement contained in ¶10 of his declaration by the other deputy is an out of court statement by a non-party, but may properly be treated as nonhearsay because Plaintiff introduced it not for the truth of the matter asserted, but rather to show the "effect on Tighe asking (again) to transfer out of the Training Unit." Dkt. 83, p. 8 n. 7.

Defendants also move to strike any reference to Exhibit 7 of Lance King's Deposition on the grounds that counsel for Plaintiff misrepresented the origins of the document, failed to lay a proper foundation for it, and it was not produced in discovery. Dkt. 63, pp. 10-11. For the reasons stated in the Court's Order denying Plaintiff's motion to exclude (*see* Dkt. 90), this motion is granted. The Court will not consider Exhibit 7 or any references to it in determining the parties' summary judgment motions.

**B.    Summary Judgment – Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute,

requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial— *e.g.*, a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson*, *supra*. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

**C.    USERRA Claims**

The parties do not dispute that USERRA guarantees returning veterans reemployment with their former employer and prohibits employers from discriminating against veterans based on their military service. 38 U.S.C. §§4301-4335. Defendants assert that they fulfilled their duties under USERRA by promptly re-employing Plaintiff, but deny that 38 U.S.C. §§4312 and 4313 were Plaintiff's sole requirements for returning to employment at KCSO (and that requiring Plaintiff to comply with RCW 43.101.125 and 43.101.095(2) was not impermissible under USERRA). Plaintiff contends that USERRA supersedes any state law that reduces, limits, or eliminates in any manner any right or benefit provided by USERRA, presumably including KCSO's retraining requirements.

As to the 2014 re-employment, Plaintiff contends that because he was not afforded the same overtime earning opportunities while he was being re-trained, he was not re-employed in "a position of like seniority, status and pay." As to the 2016 re-employment, Plaintiff claims that he was re-employed to a different unit with a less favorable work shift.

38 U.S.C. § 4312(a) provides, in relevant part:

> any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if—
>
> (1) the person ... has given advance written or verbal notice of such service to such person's employer;
>
> (2) the cumulative length of the absence and of all previous absences from a position of employment with that employer by reason of service in the uniformed services does not exceed five years; and
>
> (3) ... the person reports to, or submits an application for reemployment to, such employer.

USERRA § 4312 protects a serviceperson's right to reemployment, which in turn triggers § 4313's guarantee of the appropriate position of employment. Under 38 U.S.C. § 4313(a)(2)(A), an eligible returning serviceperson should be promptly reemployed "in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." "Prompt reemployment" means as soon as practicable under the circumstances of each case." C.F.R. §1002.181.

The regulations promulgated under USERRA provide that the employer must make reasonable efforts to help the employee become qualified to perform the duties of the position to which the employee will be reemployed. 20 C.F.R § 1002.197. In addition, "the employee is

entitled to reemployment in the job position that he or she would have attained with reasonable

certainty if not for the absence due to uniformed service." 20 C.F.R. § 1002.191. This position is

known as the "escalator position." The regulations allow an employer to take into account the

length of the employee's most recent service and the employee's qualifications when

determining the proper position for the employee. 20 C.F.R. § 1002.195.

There is no dispute that Plaintiff was covered by USERRA and that he provided proper

notice of his desire to return to KCSO in both 2014 and 2016. It is also not disputed that he

returned to work with the same seniority and pay. In fact, while he was on military orders

between July 2010 and July 2014, Plaintiff was on one type of paid leave or another for virtually

the entire period, he continued to accrue sick and annual leave, and KCSO paid 100% of medical

benefits for Plaintiff and his family and continued to contribute to Plaintiff's retirement. Dkt. 66,

Petty Dec., ¶¶ 3, 7; Ex. A. What is in dispute is whether he was returned to a "like position" on

each occasion – in 2014, so that he could earn the "same average" overtime pay and in 2016, so

that he could have the same shift.

### 1. 2014 Re-Employment

#### a. Affirmative Defense

Before turning to the substance of Plaintiff's 2014 re-employment claim, the Court

addresses Plaintiff's argument that Defendant's only defense to his USERRA claim would have

been a "changed conditions" defense, which Defendant did not plead and according to Defendant

has therefore, waived.

38 U.S.C. § 4312(d)(1) provides for three affirmative defenses to an USERRA claim,

none of which apply here. The "changed conditions" defense to which Plaintiff refers, "creates

an affirmative defense for employers so that § 4312(a) cannot act as an absolute guarantee of

reemployment, counterbalancing the protection of military service-men and women with the reality of changing business needs and employee/employer relationships that would make reemployment unreasonable." *Hays v. Commc'n Techs., Inc.*, 753 F.Supp.2d 891, 899 (S.D.Iowa 2010). "The purpose of the exemption is to allow employers who have eliminated a reservist's position or otherwise drastically changed their business to avoid rehiring someone for a job that no longer exists." *Cole v. Swint*, 961 F.2d 58, 60 (5th Cir.1992).

The exemption clearly does not apply to the facts at issue and Defendants did not raise the exemption as an affirmative defense. Rather, Defendants contend that they in fact, promptly re-employed Plaintiff and therefore, fulfilled their duties under USERRA. Dkt. 4. Plaintiff, however, inexplicably insists that because Defendants have pled no affirmative defense to his § 4312 re-employment claim, he is entitled to summary judgment on the issue of liability "for KCSO's late raising of its USERRA affirmative defense prejudices Mr. Tighe by attempting to present facts and contentions that Mr. Tighe was unable to explore in discovery." Dkt. 83. As an example, Plaintiff points to the testimony of Ms. Ehlert and for the first time, claims that he did not return to work until July 7, 2014 because he was still under military orders until that time and that Defendants failed to provide proof that he was paid before that time. Dkt. 83, p. 4. However, the record clearly reflects that Plaintiff notified KCSO that his first day back to work would be July 1, 2014 (Dkt. 57, Lussier Dec., ¶ 7, Exhibit B ("my orders are finished on July 1st, 2014")); he returned to work from Paid Military Leave of Absence effective July 2, 2014 (Reference PO#2010-158); and effective July 7, 2014, he was assigned to CID/ATS/Training Unit. *Id.*, Ex. B, p. 7. Moreover, the records reflect Plaintiff was working in the Marine Unit at the beginning of August 2014 and was officially transferred there on August 13, 2014. Dkt. 65, Ehlert Dec. Exs. C, D.

Plaintiff also points to Defendants' evidence regarding his overtime loss calculations and its claim regarding USERRA's five year exemptions. However, it is unclear what facts Plaintiff was "unable to explore in discovery" or on what legal or factual basis Plaintiff bases his contention that Defendant is attempting to "create issues of fact on a claim to which it pled no defense." Accordingly, Plaintiff's motion for summary judgment on this ground is denied.

### b. 2014 Re-Employment Claim

Plaintiff has failed to raise genuine issues of material fact precluding summary judgment in favor of Defendant on this claim. Plaintiff encapsulates his claim as follows: "This case involves an employer erecting barriers to a returning veteran that, for three months, denied Mr. Tighe the right to the same level of overtime wages he enjoyed pre-service." Dkt. 83, p. 7. As previously noted, Plaintiff does not dispute that an employer may provide necessary training and require recertifications to an employee returning from protected military leave "once that person is properly re-employed." Instead, Plaintiff argues that:

> …returning a veteran to a position where he or she does not get the paid overtime he or she "ordinarily attained" before leaving is not re-employment to a position of like pay." 20 C.F.R. § 1002.193…. Nothing forbade KCSO from giving Mr. Tighe the training KCSO said he needed while, at the same time, affording him full opportunity to earn overtime (*i.e.* the pay Mr. Tighe would have "ordinarily attained…given his job history") while undergoing that training.

Dkt. 83, pp. 2-3. Plaintiff's claim boils down to lost overtime wages for July, August, and September 2014 in the amount of $3,572.00, which he blames on KCSO's failure to properly re-employ him. Dkt. 83, p. 2; Dkt. 44, West Dec., p. 2. While he concedes that USERRA does not prohibit KCSO from re-training returning service-members, he argues that they apparently did not re-train him fast enough so that he would be returned to his previous position where he was free to engage in overtime and off duty jobs that afforded him opportunities to make the same money he "ordinarily attained" or that KCSO should have allowed him to engage in overtime

1    while re-training him. In fact, he argues, he was allowed to earn overtime on July 22, 2014,

2    which proves that KCSO could have given him the opportunity to earn the same overtime

3    (during the three months he alleges it took to get him back to the Marine Unit). Dkt. 66-2, p. 6.

4         USERRA defines "benefit of employment" in relevant part as "any advantage, profit, [or]

5    privilege ... that accrues by reason of an employment contract or agreement ... [including] ... the

6    opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2). The Court's

7    analysis is guided by the fact that an employer shall be considered to have engaged in prohibited

8    conduct under § 4311(a) only if the employee's military status is a "motivating factor." §

9    4311(c)(1).

10        Here, there is no evidence that KCSO engaged in any prohibited conduct based on

11   Plaintiff's military status. The record reflects that Plaintiff was, in fact, promptly returned to the

12   Marine Unit and was making the same pay and receiving the same benefits that he received

13   before he left for military service. In fact, it would have been impossible for him to return to the

14   Marine Unit three months after his return as he alleges because, as he himself acknowledged,

15   boating season generally ended by September 15, 2014, and he and the rest of the Marine Unit

16   had been transferred to unincorporated patrol by October 1, 2014 for the winter. The evidence

17   viewed in the light most favorable to Plaintiff also does not indicate that the relative amount of

18   overtime work that he received post-deployment differed significantly from his pre-deployment

19   overtime work. Plaintiff declares that he averaged 16.5 overtime hours per month in the two year

20   period directly prior to his 2010-2014 leave and that he earned only four hours overtime

21   compensation in July, August and September of 2014. Dkt. 42, p.2, ¶¶4, 12. Thus, his expert

22   concludes that he "missed out" on 45.5 hours of overtime during this timeframe, resulting in a

23   $3,572 loss. Dkt. 41 p. 5, ¶10; Dkt. 44 p. 7. However, as has already been established and

1  acknowledged by Plaintiff, he had returned to the Marine Unit by at least early August. KCSO

2  records reflect that he worked 4.0 overtime hours on July 22, 2014 and 2.4 hours on September

3  21, 2014, and that during the same three month period (July-September 2014), he took 8 days of

4  paid vacation leave. Dkt. 66, Petty Dec. Ex. A, pp. 19-22, Ex. B, p. 6. Plaintiff was also engaged

5  in outside employment during this time period. On July 23, 2014, Plaintiff requested and was

6  granted permission to work at VASA PARK as an off duty deputy providing security at dances.

7  He reported to his supervisor that he would work 6 hours on July 26, 2014. *Id.*, Petty Dec. Ex. D.

8  He also requested and was granted permission to work as an off duty deputy providing security

9  for the Seahawks on August 14, 2018, reporting 10 hours of outside employment between "8/9

10  and 8/11." *Id.*, Petty Dec. Ex. E. Tighe testified that he worked more of these "off duty" outside

11  employment hours than overtime hours. Dkt. 64, Second Jacobsen-Watts Dec. Ex. A, Tighe

12  Dep.19:8-20:8.

13      Thus, an actual review of Plaintiff's overtime records shows that an average is not an

14  appropriate measure of the hours he actually worked. In the years prior to Plaintiff's July 2010

15  leave, there was no consistency to the hours of overtime he worked. Sometimes he worked many

16  hours and during others, he worked no overtime at all for weeks or months on end. Dkt. 66, Petty

17  Dec. Exs. A, B, C. Thus, Plaintiff has not shown that his 2014 re-employment constitutes a

18  violation of USERRA.

19      **2.      2016 Re-Employment**

20      Plaintiff has failed to raise genuine issues of material fact precluding summary judgment

21  in favor of Defendant on this claim. Plaintiff alleges that he was placed in a "rookie/beginning

22  shift" or "entry level position" when he returned from military leave in late February 2016. Dkt.

23  1-2, ¶¶16, 65. In analyzing the requirements of Section 4313, Courts have held that in order to be

of "like status" within the meaning of USERRA, positions do not have to be identical and a court must weigh the totality of the circumstances. *Crawford v. Department of the Army*, 718 F.3d 1361 (D.C. Cir. 2013) ("USERRA strikes a balance between the veteran and the practical reality of a dynamic workplace. In considering whether a veteran has been restored to a position of "like status" we are not required to ignore constraints imposed by programs, resources, and needs that do not remain static.")

The record reflects that Plaintiff was employed as a patrol deputy for the Metro Transit Police when he left on military orders in September 2015; and that pursuant to Metro's contract with KCSO for police services, Plaintiff was transferred to unincorporated patrol on October 16, 2015 – the assignment to which he returned at the end of his leave in February 2016. Dkt. 52, Jutilla Dec., ¶5. The record also reflects that the duties of a patrol deputy are roughly the same in unincorporated patrol and Metro; neither Metro patrol nor unincorporated patrol are specialized assignments; the pay is identical; and there is no specialized training or service requirements for Metro patrol deputies as opposed to those assigned to unincorporated patrol. Dkt. 57, Lussier Dec., ¶ 15.

Plaintiff has produced no evidence that but for his military leave, he would still have been assigned to Metro in February 2016 as under the CBA, the KCSO retains the right to involuntarily transfer employees between assignments based on operational and administrative needs. Dkt. 57, Lussier Dec., ¶ 5. While, a deputy may request to transfer to a particular assignment, he can be moved at any time based on staffing needs. *Id*. When he returned in 2014, Plaintiff specifically requested that he be returned to the Marine Unit. However, when he returned in July 2016, there is no evidence that he wanted to return to Metro before he requested the transfer in July 2016. Dkt. 52, Jutilla Dec. ¶6.

Plaintiff also alleged that he was working "10 AM to 8 PM" at Metro in downtown Seattle prior to his 2015 military leave and that he returned to "graveyard shifts" in North Bend upon his return. Dkt. 42, p. 4, ¶14, p. 5, ¶17. However, KCSO records reflect that Plaintiff did not work graveyard shifts and King County did not have a contract with the city of North Bend by 2016, when Plaintiff returned to KCSO. Dkt. 65, Ehlert Dec. ¶ 11. Plaintiff was working second shift at Metro before he left and he went to second shift at Precinct 4 when he returned and Precinct 4 and Metro are roughly equidistant from his home. *Id.*, ¶ 7, Ex. E; Dkt. 57, Lussier Decl., Ex. D, p. 8.

Plaintiff's subjective complaints about unincorporated patrol do not raise questions of material fact relating to any difference in duties or status between unincorporated patrol and Metro. He claims that unincorporated patrol is for "rookies," however the CBA gives preference to non-probationary officers for filling patrol vacancies. Dkt. 27, Lussier Dec., Ex. A; Dkt. 50, Jacobsen-Watts Dec., Ex. A, Tighe Dep. 44:17-18. He subjectively believes, without providing any evidence of it, that the "people are better" at Metro, that some contract cities (but not necessarily Metro) have more resources, that some unincorporated areas have higher crime (but not necessarily the specific area to which he was assigned), and that there is a lack of consistency in unincorporated patrol. *Id.*, Tighe Dep. 44:8-21; 47:1-25. However, Plaintiff fails to support his subjective beliefs with evidence from which the Court may reasonably infer that when KCSO placed Plaintiff in unincorporated patrol when he returned from military service in 2016, that they failed to place him in a "position or a position of like seniority, status, and pay." Plaintiff refers to unincorporated patrol as "rookie patrol" but then also notes that one of the reasons he did not like unincorporated patrol was because a deputy had to work there for 30 years to get assigned to first shift. Dkt. 50, Jacobsen-Watts Dec., Ex. A, Tighe Dep. 22:23-24. Because shifts

1    are assigned by seniority, and if unincorporated patrol is exclusively for "rookies," then Plaintiff

2    should have been easily able to bid for any shift he wanted with 14 years of seniority. Dkt. 57,

3    Lussier Dec. ¶5.

4           Thus, Plaintiff has not shown that his 2016 re-employment constitutes a violation of

5    USERRA.

6    **C.     Expiration of USERRA Protected Benefits Claim**

7           Plaintiff also claims that Defendant King County violated USERRA by "wrongly telling

8    Mr. Tighe that his USERRA protected benefits would expire should he serve more than five

9    years in the military." Dkt. 41, p. 13. The letter at issue was sent in August 2013 and states, in

10   relevant part, "I am writing to remind you that the King County policy restricts military leave

11   benefits to five years, and though you have some cushion left, we wanted to alert you that your

12   military leave benefits would expire in August 2015." Dkt. 42, p. 21.

13          USERRA protects reemployment after as much as five years of military leave, but

14   exempts certain military service that is for the purpose of training and professional development.

15   10 U.S.C. § 10147; 32 U.S.C. §§ 502(a) and 503; 20 C.F.R. §§ 1002.99, 1002.103(3). The

16   essence of Plaintiff's claim is that, at the time KCSO sent this letter, it should have known some

17   of his military orders (approximately 380 days' worth), were exempt from the five year cap. The

18   parties dispute whether KCSO was obligated to determine whether Plaintiff's military orders

19   were exempt from calculation under 38 U.S.C. 4312 (as the purpose of the orders is not entirely

20   clear from their face). Assuming without deciding for purposes of this motion only, that portions

21   of Plaintiff's military orders are in fact exempt, there is no evidence that KCSO took any adverse

22   action as a result of its determination that Plaintiff's benefits would expire two years after the

23   date of the letter. Even if KCSO's determination was incorrect, there is no evidence that it

restricted or limited any benefit to which Plaintiff was entitled to under USERRA, the CBA, or its own policies or procedures. Moreover, aside from Plaintiff, King County has only notified one other individual that he was getting close to the five year entitlement (*see* Dkt. 65, Ehlert Dec. ¶10), so this does not constitute a practice of the County which should be, as Plaintiff suggests, estopped or enjoined. Additionally, Plaintiff's claim that the County's alleged miscalculation "continues to harm him to this day (should he decide to seek work elsewhere in King County) (Dkt. 41, p. 3) is highly speculative and is unsupported – particularly in light of Plaintiff's application for and receipt of a medical retirement in October 2016; that he is unlikely to work as a deputy in the future; and that he declined assistance in finding another job in King County. Dkt. 57, Lussier Dec., Ex. F; Dkt. 1-2; Dkt. 64, Second Jacobsen-Watts Dec., Ex. B, David Shaw, M.D. Dep., 27:2-12; 56:7-58:25; 51:11-52:5.

Accordingly, based on the foregoing, Plaintiff's motion for partial summary judgment (Dkt. 41) is **DENIED** and Defendants' motion for summary judgment (Dkt. 59-1 (*originally filed under* Dkt. 45)) is **GRANTED as to Plaintiff's USERRA claims**. The remainder of Defendants' motion for summary judgment (Dkt. 59-1 (*originally filed under* Dkt. 45)) (regarding Plaintiff's claims under the Washington State Law Against Discrimination ("WLAD"), RCW Chapter 49.60 Washington State Constitution, Art. I, § 7, and 42 U.S.C. § 1983), will be addressed under separate Order.

DATED this 17th day of January, 2019.


_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge